1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA
### FRESNO DIVISION

11  **ZERON LEWIS,**                                  CASE NO. 08cv0189-DMS(RBB)

12
13                                      Petitioner,   **ORDER LIFTING STAY AND DENYING 28 U.S.C. § 2254 PETITION FOR WRIT OF HABEAS CORPUS**
        vs.
14

15                                                    [Dkt Nos. 1, 26]
16  **J. D. HARTLEY, Warden,**

17                                      Respondent.

18

19      Petitioner Zeron Lewis ("Lewis"), a state prisoner serving an indeterminate sentence of twenty-

20  seven years to life for a March 1981 first-degree murder with use of a firearm, proceeding *pro se*, filed

21  a 28 U.S.C. § 2254 Petition For Writ Of Habeas Corpus on February 6, 2008. Lewis alleges the Board

22  Of Parole Hearings' ("Board") violated his due process rights when it denied him parole at his sixth

23  suitability hearing in February 2006. Respondent filed an Answer (Dkt No. 16), and Lewis filed a

24  Traverse (Dkt No. 21). Respondent concedes the Petition is timely under 28 U.S.C. § 2244(d)(1) and

25  is not subject to any other procedural bar. (Dkt No. 16, 2:19-20.)

26      On November 25, 2008, this case was reassigned for all purposes from the bench of the Eastern

27  District of California to the undersigned visiting judge. (Dkt No. 22.) By Order entered

28  March 13, 2009, the Court stayed the matter in anticipation of the Ninth Circuit's *en banc* decision on

rehearing of Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008), *reh'g en banc granted by* 527 F.3d 797 (9th Cir. 2008), *vacated by* Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) *(en banc)*. (Dkt No. 25.) The *en banc* decision issued April 22, 2010. Among other things, that decision has answered the questions for this Circuit "whether federal constitutional law imposes on the states a requirement for some quantum of evidence to support a state's denial of parole," and "whether, even if there is no general federal quantum of evidence requirement, applicants for parole in California, under the state's current laws, may obtain federal habeas review of whether there is 'some evidence' supporting a negative parole decision." Hayward, 603 F.3d at 549. The Court now lifts the stay and reaches the merits of Lewis' due process claims, applying the clarified review standards. For the reasons discussed below, the Petition is **DENIED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Federal habeas courts presume the correctness of state courts' factual findings. 28 U.S.C. § 2254(e)(1). The only reasoned state court decision to address the merits of Lewis' due process challenge to the February 2006 denial of parole is from the Los Angeles County Superior Court. (Dkt No. 1, pp. 287-88.) Lewis does not dispute that court's statement of underlying facts taken from the record, but he contends he fired the first shot accidentally or in self-defense. The court summarized:

> The Petitioner was received in the Department of Corrections on November 20, 1981 after being convicted of first degree murder with use of a firearm. He was sentenced to a term of twenty-seven years to life. His minimum parole eligibility date was May 5, 1998.
>
> The record reflects that on March 6, 1981, the Petitioner confronted Cecil Gardner regarding a small amount of money that Mr. Gardner owed to the Petitioner. When Mr. Gardner refused to give him the money, the Petitioner shot him at point blank range in the face. The victim fell and the Petitioner aimed for the victim's face and fired three more rounds. Just before his demise, the victim told police that "Zeron Lewis shot me."

(Dkt No. 1, p. 287.)

In denying habeas relief, the court found "some evidence" supported the Board's determination Lewis was not suitable for parole, relying primarily on the nature of the crime. The California Court of Appeal and the California Supreme Court summarily denied Lewis' subsequent habeas petitions to those courts on October 2, 2007 and December 12, 2007, respectively. (Dkt No. 1, pp. 290, 293.)

**II.    DISCUSSION**

**A.    Legal Standards For Federal Habeas Relief**

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas courts are bound by a state's interpretation of its own law. Estelle v. McGuire, 502 U.S. 62, 68 (1991) (federal courts may not reexamine state court determinations on state-law questions); Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990) (federal courts "have no authority to review a state's application of its own laws").

Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* Lindh v. Murphy, 521 U.S. 320, 322-23 (1997). AEDPA establishes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7. The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Federal habeas relief is warranted only if *the result* of a claim adjudicated on the merits by a state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see* Bell v. Cone, 535 U.S. 685, 694 (2002); *see also* Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding"), *citing* 28 U.S.C. § 2254(d)(2). A federal court applies AEDPA standards to the "last reasoned decision" by a state court. Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); *see* Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground").

\\

1 . **B.** **Due Process Review Standards Applicable To Denials Of Parole**

2 **1.** **Federal Standards Of Review**

3 A due process claim raises two questions: "the first asks whether there exists a liberty or
4 property interest which has been interfered with by the State; the second examines whether the
5 procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of
6 Corrections v. Thompson, 490 U.S. 454, 460 (1989) (citations omitted). "[A]n individual claiming
7 a protected interest must have a legitimate claim of entitlement to it" arising either from "the Due
8 Process Clause itself" or from "the laws of the States." Id. (citation omitted). Both the Ninth Circuit
9 and the California Supreme Court "have been engaged in modification of the law to determine what
10 limits there are on denial of parole." Hayward, 603 F.3d. at 552 ("Hayward's appeal addresses what
11 if anything the federal Constitution requires as a condition of denial of parole"), *citing* 28 U.S.C. §
12 2254(a). The *en banc* Hayward decision has clarified the standards federal habeas courts in this Circuit
13 must apply in reviewing California prisoners' due process challenges to parole denials.

14 In particular, one question presented was whether "federal constitutional law imposes on the
15 states a requirement for some quantum of evidence to support a state's denial of parole." Hayward,
16 603 F.3d at 549. The majority opinion distinguished the deprivation of good time credits earned by
17 prisoners while incarcerated, creating "a liberty interest of the most fundamental sort," from denial of
18 release on parole, a decision entailing the "discretionary assessment of a multiplicity of
19 imponderables." Id. at 557; *see also* id. at 555, n.44. The Hayward court held: "in the absence of state
20 law establishing otherwise, there is no federal constitutional requirement that parole be granted in the
21 absence of 'some evidence' of future dangerousness or anything else." 603 F.3d at 561. The "right in
22 California to parole in the absence of some evidence of one's future dangerousness to the public arises
23 from California law."[1] Hayward, 603 F.3d at 563 ("We overrule any decisions suggesting that the
24 \\

25

26 ─────────
[1] The *en banc* majority declined to decide "whether the California parole scheme establishes a
27 predicate for imposing [the liberty interest] as a matter of federal constitutional law." Hayward, 603 F.3d at
562 (finding it need "not decide whether a right arises in California under the United States Constitution to
28 parole in the absence of some evidence of future dangerousness" because "State law already does what
Hayward would have federal constitutional law do").

1    federal constitution imposes a requirement of 'some evidence' of future dangerousness without regard
2    to state law").[2]  Nevertheless:

3                      Although the due process clause does not, by itself, entitle a
                      prisoner to parole in the absence of some evidence of future
4                      dangerousness, state law may supply a predicate for that conclusion.
                      "[D]espite the necessarily subjective and predictive nature of the
5                      parole-release decision, state *statutes* may create liberty interests in
                      parole release that are entitled to protection under the Due Process
6                      Clause."

7    Hayward, 603 F.3d at 561, *adding emphasis and quoting* Bd. of Pardons v. Allen, 482 U.S. 369,
8    371 (1987).

9            The "crucial determinant of whether the prisoner gets parole in California is 'consideration of
10   the public safety.' " Hayward, 603 F.3d at 561-62 *citing* In re Lawrence, 44 Cal.4th 1181 (2008) *and*
11   In re Shaputis, 44 Cal.4th 1241 (2008) ("[T]he California Supreme Court established in [those] two
12   decisions . . . that as a matter of state law, 'some evidence' of future dangerousness is indeed a state
13   *sine quo non* for denial of parole in California," creating a liberty interest).  Once the evidence
14   establishes that "necessary predicate for denial of parole," the due process standard is satisfied. Id. at
15   552. "There was some evidence of future dangerousness, so [Hayward's] parole was [properly] denied,
16   and the district court correctly denied the writ."[3] Id. at 563.

17           The Ninth Circuit succinctly extracted pertinent holdings from the Hayward opinion in Pearson
18   v. Muntz, 606 F.3d 606 (9th Cir. 2010). It is "state law that gives rise to 'interests' on the part of state
19   prisoners that may be enforced as a matter of federal law." Id. at 609. Federal courts "must apply the
20   California 'some evidence' test on federal habeas review under AEDPA." Id. at 608. "[F]ederal habeas
21   courts *must* 'decide whether the California judicial decision approving the governor's decision rejecting
22   parole was an "unreasonable application" of the California "some evidence" requirement, or was

23

24

25           [2] "To the extent our prior decisions including Biggs v. Terhune[, 334 F.3d 910 (9th Cir. 2003)], Sass
     v. California Board of Prison Terms[, 461 F.3d 1123 (9th Cir. 2006)], Irons v. Carey[, 505 F.3d 846, 850-51
26   (9th Cir. 2007)] and our panel decision in this case might be read to imply that there is a federal constitutional
     right regardless of whether state law entitles the prisoner to release, we reject that reading and overrule those
27   decisions to the extent they may be read to mean that." Hayward, 603 F.3d at 555 (footnotes omitted).

28           [3] The Hayward *en banc* court also held a Certificate Of Appealability is required to appeal a district
     court's Order denying a writ of habeas corpus for a denial of parole. Hayward, 603 F.3d. at 554-55.

1 | "based on an unreasonable determination of the facts in light of the evidence." ' "[4] Id. at 608, *quoting*
2 | Hayward, 603 F.3d at 563. "By holding that a federal court may review the reasonableness of the state
3 | court's application of the California 'some evidence' rule, *Hayward* necessarily held that compliance
4 | with the state requirement is mandated by federal law, specifically the Due Process Clause." Id. at 609.

5 | Inasmuch as "*Hayward* specifically commands federal courts to examine the reasonableness
6 | of the state courts' application of the California 'some evidence' requirement, as well as the
7 | reasonableness of the state court's determination of the facts in light of the evidence," the federal court
8 | must review "*how* the state court applied the requirement." Pearson, 606 F.3d at 609, *quoting*
9 | Hayward, 603 F.3d at 562-63. A parole denial is not justified "merely because the state court
10 | purported to identify some evidence of future dangerousness;" there must actually be " 'some evidence
11 | of future dangerousness' justifying the denial of parole." Id.

12 | ## 2. California Parole Statute And Parole Denial Standards Of Review

13 | Under California law, prisoners subject to indeterminate life sentences with the possibility of
14 | parole "may serve up to life in prison, but they become eligible for parole consideration after serving
15 | minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078 (2005). "[L]ife inmates'
16 | actual confinement periods within the statutory range are decided by [the Board of Prison Terms]."
17 | Id. The Board must make parole decisions in the manner prescribed by CAL. PENAL CODE § 3041 and
18 | implementing regulations, applying "detailed standards" to evaluate "whether an individual is
19 | unsuitable for parole on public safety grounds." Dannenberg, 34 Cal.4th at 1096 n.16; *see* In re
20 | Rosenkrantz, 29 Cal.4th 616, 676-77 (2002) (the Board's discretion is circumscribed by the
21 | requirement "the decision must reflect an individualized consideration of the specific criteria and
22 | cannot be arbitrary and capricious"). The regulations describe the treatment of evidence:

23 | > All relevant, reliable information available to the panel shall be
> considered in determining suitability for parole. Such information shall
24 | > include the circumstances of the prisoner's social history; past and
> present mental state; past criminal history, including involvement in
25 | > other criminal misconduct which is reliably documented; the base and
> other commitment offenses, including behavior before, during, and
26 | > after the crime; past and present attitude toward the crime; any

27 |

28 | [4] The Governor may review the Board's parole decisions and is authorized to reverse or modify them, applying the same standards as the Board. CAL. CONST. art. V, § 8, subd. (d); CAL. PENAL CODE § 3041.2.

> conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

CAL. CODE REGS., tit. 15, §§ 2281(b), 2402(b).

Thus, the Board must consider both circumstances tending to show unsuitability[5] and circumstances tending to show suitability[6] in each case. The factors "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." Lawrence, 44 Cal.4th at 1203, *quoting* CAL. CODE REGS, tit. 15, § 2281, subds. (c), (d). "A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d)," but "[a] parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c)." CAL. CODE REGS., tit. 15, § 2401. While the Board must consider all pertinent information, "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." Lawrence, 44 Cal.4th at 1212. "[I]t is not enough that there is some evidence to support the factors cited for the denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, *i.e.*, that a prisoner's release will unreasonably endanger public safety." In re Roderick, 154 Cal.App.4th 242, 263, 264 (2007) ("Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety"), *citing, inter alia,* In re Lee, 143 Cal.App.4th 1400, 1409 (2006).

---

[5] Guideline circumstances tending to show unsuitability include: (1) the heinousness or cruelty of the commitment offense; (2) the prisoner's previous record of violence, "particularly if the prisoner demonstrated serious assaultive behavior at an early age;" (3) unstable social history in relationships with others; (4) sadistic sexual offenses; (5) psychological factors; and (6) engaging in serious misconduct while incarcerated. CAL. CODE REGS., tit. 15, §§ 2402(c), 2281(c).

[6] Guideline circumstances tending to show suitability include: (1) no juvenile record; (2) reasonably stable social history; (3) signs of remorse, such as performing acts or giving "indications he understands the nature and magnitude of the offense;" (4) the crime was the result of significant personal stress; (5) lack of any significant history of violent crime; (6) the prisoner's present age as reducing the probability of recidivism; (7) realistic plans for the future upon release, or development of marketable skills usable upon release; and (8) institutional behavior "indicating an enhanced ability to function within the law upon release." CAL. CODE REGS., tit. 15, §§ 2402(d), 2281(d).

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel [or Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." CAL. CODE REGS., tit. 15, §§ 2281(a), 2402(a).[7] Due process is satisfied as long as at least "a modicum of evidence" supports the decision. Rosenkrantz, 29 Cal. 4th at 676-77 ("As long as the Governor's decision reflects due consideration of the specified factors applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision"). "[I]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." Id.

When an unsuitability determination is based on the circumstances of the offense, the decision must identify "some evidence" of aggravating facts beyond the minimum elements of that offense. Rosenkrantz, 29 Cal.4th at 683. Moreover, reliance on an aggravated commitment offense to deny parole must also entail the identification of other evidence supporting an inference of current dangerousness. The Hayward court summarized:

> As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (footnotes omitted), *quoting* Lawrence, 44 Cal.4th at 1210, 1213-14.

While judicial review of a parole denial is "extremely deferential," the purpose of the review is to ensure the result was supported by "some evidence." Hayward, 603 F.3d at 562; *see also*

---

[7] "The two sections are identical." Lawrence, 44 Cal.4th at 1202 n.5. CAL.CODE REGS., tit. 15, § 2402 provides the Parole Consideration Criteria And Guidelines For Murders Committed On Or After November 8, 1978. CAL. CODE REGS., tit. 15, §§ 2281(a) provides the parole criteria and guidelines applicable to murderers whose crime was committed before then. The Lawrence court applied section 2281; the Rosenkrantz court applied section 2402.

Rosenkrantz, 29 Cal.4th at 660; Dannenberg, 34 Cal.4th at 1071. A reviewing court need only verify that evidence of the factors recited as the reasons for denial supports the "core determination" of present dangerousness.[8] Lawrence, 44 Cal.4th at 1212 ("the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public"); *see* id. at 1227 (setting aside the Governor's action in vacating the Board's grant of parole based on the "immutable and unchanging" circumstances of the "egregious" commitment offense, on grounds the denial decision was not supported by "some evidence" of the prisoner's current dangerousness).

## B. February 2006 Subsequent Parole Suitability Hearing

Lewis provides the transcript of his February 2, 2006 subsequent parole suitability hearing as an exhibit to his Petition. (Dkt No. 1, pp. 25-104.) The form the panel prepared to summarize the outcome of that hearing memorializes the decision to deny him parole for two more years and sets a subsequent suitability hearing for February 2008, with the recommendations Lewis get self-help, stay discipline free, get therapy, receive no more 115's or 128's, and earn positive chronos. (Id., p. 24.)

Lewis represented himself at the hearing, although he had attorney representation at his five prior hearings. (Dkt No. 1, 27:14-28:4.) The panel explored the details of the commitment crime interactively with Lewis, who described how he came to have the revolver and hide it in a bag outside the liquor store, and how he encountered the victim there, took the gun out of the bag, pointed it at him and attempted to cock it, purportedly to show Mr. Gardner he "meant business" so he would back off and "leave me alone." (Id., 40:17- 42:14.) Lewis told the panel as he got the trigger hammer "about half way back that's when the gun slipped and shot him in the face." (Id., 42:15-17.) Lewis stated he became afraid "and decided that [he] needed to kill him and that is why [he] fired the other shots." (Id., 42:18-27.) He said his fears were a combination of being "afraid of getting caught" and "what happens if I confront this guy again," because the documented extent of Mr. Gardner's criminal record included arrests for assaults with deadly weapons. (Id., 42:27-43:16.) Lewis knew that several

---

[8] This standard disposes of Lewis' request for an evidentiary hearing. (*See* Dkt No. 21, 14-20.) The Court may not adjudicate factual disputes on federal habeas review. No additional development of the record would remove from the existing record the "some evidence" of unsuitability based on public safety concerns the Court has confirmed supports the state judicial decision to uphold denial of parole.

1   witnesses said he shot the victim in the head several times at point blank range, but he stuck to his

2   accidental initial shot theory when pressed by the panel:

> INMATE LEWIS: . . . Well actually what happened was when he – when I shot him in the face, as I said, it was accidentally first [sic] slipped off and then he fell and when he fell to the ground, I looked around and didn't see – I was looking for who might have seen the incident or whatever I was in disbelief that I had shot him . . . . Okay, but then he got up and he ran away and that's when I made a split decision [sic] to try to –
>
> PRESIDING COMMISSIONER FISCHER: Finish the job, huh? Okay. All right.
>
> INMATE LEWIS: In reference to that, I would like to let the panel know that all these years I had, you know, I had been seeing myself as a victim and I realized that that's not true. I was a bad guy. I shouldn't have armed myself with a gun and I shouldn't have (indiscernible).

11   (Dkt No. 1, 44:11-45:2.)

12        The panel reviewed Lewis criminal history, starting at age 17 when he was picked up for

13   marijuana possession, then for a 1974 battery, for a 1975 assault with a deadly weapon arrest later

14   dismissed, and for carrying mace or pepper spray at a time when that was illegal in California. (Dkt

15   No. 1, 45:20-47:10.) Lewis had dropped out of school, became involved in Job Corps (culinary and

16   building maintenance), and had two sons by different women with whom he maintained a relationship

17   before his 1981 commitment offense. (Id., 48:13-49:6.) Turning to his parole plans, the panel noted

18   Lewis had letters from several half-way house re-entry programs that help released prisoners with AA,

19   transportation, housing options, and employment services. Lewis did not identify specifically where

20   he planned to live and work upon his release, but correspondence in his file indicated he had made

21   arrangements for such assistance in the past. (Id., 49:21-52:1.)

22        The panel reviewed Lewis' programming, concentrating on the period since his last suitability

23   hearing in September 2004. He had a current custody level of medium-A. He had been assigned to

24   PIA Furniture factory where he was a wood machinist with work performance grades above average

25   to exceptional based on various chronos, and he had received a certificate of proficiency in November

26   2004 acknowledging over 9,000 hours in that occupational category, but without recent participation

27   in any academics. (Dkt No. 1, 53:19-54:27, 55:10-56:6.) He had no negative discipline in that interval

28   of time and continued his participation in AA. (Id, 55:1-6.) He was able to discuss the 12-steps of the

1   AA program and what he had done toward achieving them. (Id. pp. 61-62.) The panel asked Lewis
2   what else he did with his free time. He had participated in the hobby program from 1999 until the
3   program was cancelled in 2005. He plays basketball sometimes and does physical workouts. He reads
4   astrology books and the Bible, occasionally participating in church activities. (Id., 56:9-57:24.) The
5   panel asked if he read books from the prison library, for example about human behavior that would
6   relate to himself and his criminal history. Lewis stated he does not check books out of the library, but
7   sometimes picks up a cowboy book or mystery novel elsewhere. (Id., 58:6-23.)

8         The panel noted from Lewis' file he had received his GED in August 1993. He had completed
9   the vocational masonry program in 1996, with good work reports, and had held numerous jobs
10  including yard crew, kitchen, PIA laundry, adult basic education, and furniture factory for seven years.
11  (Dkt No. 1, 58:26-59:14.) A letter substantiated he had participated in NA since April 1996 and had
12  acted as a liaison between facility staff and an AA group, observing he had "grown to understand the
13  misfortunes of living a lifestyle of drug and alcohol dependency." (Id., 61:11-62:19.) The letter
14  further stated he had "demonstrated leadership skills by maturely leading and sharing in group
15  discussions," among other things. (Id., 62:20-26.) He had also helped at a fund raiser in 1997. (Id.,
16  63:1.) Other accomplishments in the self-help area were an 18-hour anger management program in
17  2003, participation in a substance abuse program in 1997 separate from AA or NA, and a life skills
18  self-help program several years earlier. (Id., 63:3-8.) The panel expressed concern about his self-help
19  efforts because, other than AA, "it's been since '03 that you did the conflict resolution," and his life
20  skills self help was back in the 1990's. (Id., 63:17-25.) Lewis told them there was not much available.
21  The panel noted he had been at Avenal State Prison since 1998, and other inmates recently appearing
22  for parole hearings from there were producing "a lot of chronos and certificates of completion in
23  various areas," while they found no "current laudatories" for him. (Id., 64:8-17.)

24         Lewis had six 115's, most recently in 1991, and fourteen 128's, the last in 1997, and the panel
25  commended him for going almost 15 years without a serious write-up. (Dkt No. 1, 64:17-21.) He told
26  the panel he does not believe he poses any "risk to the safety of the people outside the prison walls
27  today" because now he "think[s] like a law abiding citizen," does not use drugs or alcohol, has "a
28  different outlook on life," and is "more mature," with "a strong work ethic." (Id., 64:27-65:13.)

11               08cv0189

1      Turning to Lewis' two most recent psychological evaluations, the panel extracted from a

2  May 29, 2005 report by Dr. Corinne Schroeder (*see* Dkt No. 1, pp. 198-203) her conclusions his

3  "mental status is clear in all areas of the exam: behavior, speech, thought content, thought processes,

4  speech and cognition." (Dkt No. 1, 65:18-66:8.) "Under diagnosis under Axis I alcohol abuse in full

5  remission, Axis II no diagnosis and Axis V a global assessment of functioning on a scale from one to

6  100 yours coming back at 80." (Id., at 66:8-10.)

> In the area of the review of the life crime, the doctor writes in part, as
> she's discussing with you the crime, as we were in the liquor store
> waiting for a ride, it was an informal meeting for my friends, every
> body that we knew in our neighborhood that's when I encountered Cecil
> Gardener, my victim. He got out of his brother-in-law's car calling me
> all kind[] of pun[k]s. That's when I got the gun I had stashed along side
> the liquor store in a paper bag so it would be inconspicuous. . . . . I told
> him to back up off of me and leave me alone. To show I meant
> business – to show I meant business, I cocked the trigger back and
> trigger slipped out of my grip before I could get it uncocked, went off,
> shot him in the face point blank. He fell to the ground. That's when I
> panicked, looked around to see who might've -- who might have seen
> something. When he got up to run away that's when I made the
> decision to kill him before he could tell anyone that I shot him in the
> face. It was a split-second decision, no one was there to witness it. I
> left the scene.

15  (Dkt No. 1, 66:8-67:10; *see* id., pp. 201-203.)

16      The panel continued: " In the area of remorse, the doctor writes quote, I am very sorry for what

17  I did. We would have gotten past this like the time before[. W]e were friends." (Dkt No. 1, 67:10-13;

18  *see* id., p. 203.) The Schroeder report rated Lewis' dangerousness to others as below average for the

19  parolee population and equal to the general population in society. (Id., 67:13-17.) Her clinical

20  observations, comments, and recommendations concluded he had "come to terms with his crime," he

21  was "honest and forthcoming in his description of his crime which corresponds with the depiction of

22  the crime in 1981 POR," he "made no excuses and accepted full responsibility," his "remorse is

23  sincere," and he "is ready to go home." (Id., 67:17-23; id., p. 203.).)

24      The prior psychological report was prepared May 19, 2004 by Charles Silverstein. (Dkt No.

25  1, 67:25-27; *see* id., pp. 192- 197.) The panel read into the record his findings with respect to Lewis'

26  then-current mental status and treatment needs, and his conclusion:

> Based on the information available, it would appear that the inmate
> currently presents a somewhat lower risk of violence than the average

12                                                    08cv0189

inmate. When compared to the average unconfined citizen, his risk of
violence seems to be approaching the average range but only with the
strict caveat that he refrain from all forms of substance abuse and seek
therapy for social adjustment issues if released. Clinical observations,
comments and recommendations, in part, from this standpoint, he
would appear to be a reasonable candidate for a high control parole.

(Dkt No. 1, 68:2-69:21.)

Despite those evaluators' observations on the issue of present dangerousness, the panel
expressed reservations on that ultimate question, in consideration of significant discrepancies in the
life-crime descriptions in the record. In "previous hearings and certainly during your trial there have
been statements made regarding what you say happened," and "not everyone seems to feel that that was
the way it went down." (Dkt No. 1, 70:10-14.) At least one witness had made statements inconsistent
with Lewis' self-defense trial theory and his accidental shot theory, and his statements to the police at
the time were also inconsistent with those theories. (Id., 70:14-16.) The panel quoted statements from
the responding officer's report unequivocally admitting he intended to shoot "the mother fucker" and
to "kill that asshole because I'm tired of his shit," among other things. (Id., 75:15-76:25 ("and then it
says you're saying that you and the victim began -- began to argue back and forth as -- and as the
suspect put it quote, I'll wait for him to get close then I'll kill that asshole, end of quote").) The
commissioner continued:

> Then the Deputy goes on when the victim got within an arm's reach
> length of the suspect, the suspect grabbed his gun and it [sic] almost at
> point blank range shot the victim in the face. The victim fell back as the
> suspect aimed for the victim's head and fired again. The suspect stated
> that he advanced on the victim to ensure that his next shots killed the
> victim. I guess my question to you is that, from the Deputy the first
> responder writes in his report, is that information that I've read
> inaccurate?
>
> INMATE LEWIS: Yes. I mean, it's a lot – it's a lot of truth to the – to
> the initial contact with the officer but then, okay, when it came down
> to the details, he threw me in a holding cell, he made his report
> completely without accurate step-by-step of what exactly happened. I
> encountered him on – in the field and you know, sure I said shot [sic]
> him because he's an asshole and I guess from there he built his own
> story around that.

(Dkt No. 1, 76:25-77:19; see id., 70:20-25 ("Well, like I said at the time this incident all occurred I felt
as though I was a victim and I think that the reason a lot of the statements got conflicted, you know,
about what I said because of the – based on my  initial response").)

1      My initial response to the police where I said I shot him and he was an
       asshole. So from that point on I guess, you know, things they wanted
2      to make -- to get a bad guy off the street and that's the perception I
       given [sic] and that's basically what I was for carrying a gun, it's just a
3      bad guy . . . .

4  (Dkt No. 1, 72:1-7.)

5      One panel member observed: "Well, based on the things that you said, it sounds like – I mean

6  it sounds like you went there, hid the gun and waited to kill him." (Dkt No. 1, 72:9-12.) Lewis

7  disputed he was lying in wait for the victim at the liquor store, admitting only he "had the gun but it

8  was for completely other reasons." (Id., pp. 73-75.) The panel reminded Lewis of his inconsistent

9  statements earlier in the hearing that "the gun slipped" and "it was an accident" and he was in "disbelief

10 that I had shot him, end of quote," all statements absent from police reports and trial. (Id., 77:21-78:2)

11     [A]ll of those quote[s] that you gave today are complete, complete – in
       disagreement with what you told the officer. In other words what you
12     told the chair today and reading this report, there's nothing accurate in
       his report . . . . I'm saying why did the officer do you think so such [sic]
13     an inaccurate report? In other words, why is it so different then what
       was said at the scene -- on the scene?

14
       INMATE LEWIS: Like I said I refuted those [sic] testimony, you
15     know, through the course of my trial [where his theory was self-
       defense] . . . .

16
   (Dkt No. 1, 78:3-18.)

17
       The panel reminded Lewis "[y]ou're not being retried today." (Dkt No. 1, 78:16-79:3.) The

18
   panel reviewed with him another documented police interview where he described his movements and

19
   intentions before the shooting, including his having "placed the weapon in a brown paper bag together

20
   with three extra wide rounds and this in quotes in case he needed to reload."  (Id., 79:21-80:7.)

21
       And then they actually gave you a toy gun and had demonstrate [sic]
22     how the shooting took place and there's nothing in this at all where you
       said that it accidentally shot the first time or showed them that. In fact
23     it says the suspect stood three feet away from the gun and indicated that
       the victim was about three feet from the suspect in the opposite
24     direction. The suspect reached down, got the gun, aimed it at a pretend
       victim and stated I shot him once in the head. He went down and I
25     thought he was dead but then he got back up and started running away
       from me, I shot at him again but missed, I shot a third time and hit him
26     somewhere in the back and he went down again and then I left. And it
       says finally the suspect stated that he -- that he was not wrong for what
27     he did because the victim was always quote, messing with him.

28 (Dkt No. 1, 80:8-26.)

14                                              08cv0189

1    Lewis denied he told police that he went looking for the victim and took extra bullets. (Dkt
2  No. 1, 82:2-6.) A panel member persisted: "So I guess what I'm trying to do is get into your state of
3  mind because even if you thought some how it was self-defense and that you were a victim wouldn't
4  in that state where they're taking you down there and interviewing you at the police department,
5  wouldn't you have been saying that first shot was an accident?" ( Id., 80:26-81:5.) Lewis accused the
6  detective of wanting "to make sure that I got put away" because "this incident was widely viewed in
7  the neighborhood and followed in the neighborhood ." (Id., 81:8-13.) His ultimate explanation for
8  the discrepancies was that "all I been trying to say all these years is that the story got mixed up and
9  when I got to court, it was a completely different account of what I actually did and that's why I
10  maintain that I didn't – you know, I didn't continue shooting Mr. Gardener initially and it just got out
11  of hand and everything just snowballed." (Id., 81:21-82:1.)

12    The panel also read into the record portions of a letter Lewis wrote to Sacramento in December
13  1983 requesting evaluation of his case for possible "executive clemency."  In that letter, he disputed
14  the prosecution's representations at trial that he shot Mr. Gardner with intent to kill rather than in self-
15  defense. (Id., 88:23-25: "I shot the victim, Cecil Gardner, out of self-defense when he continued to
16  advance me [sic] only then did I use bad judgment when I fired two more shots at him.") The panel
17  noted the absence in that letter of any reference to an accident, or that the gun slipped, or his reaction
18  of disbelief that he'd shot the victim, and asked Lewis to reconcile his current version of the murder
19  with his prior statements. He stated, "I guess my frame of mind at the time – at the time I wrote that
20  letter I was still believing that that, I guess, justified it killing Mr. Gardener." (Id., 90:3-15.)

21    The DA elicited at the hearing: Lewis was 25-years-old at the time of the crime; he had known
22  the victim since childhood; about two years before the murder, Mr. Gardner beat Lewis up in a fight;
23  at about that same time, Lewis loaned him $20; on the day of the murder, Mr. Gardner repaid half that
24  debt, $10 Lewis lost at a dice game they were playing; Lewis claimed to have later armed himself with
25  a gun for general protection because he was leaving his neighborhood; Mr. Gardner was dropped off
26  at the liquor store and approached Lewis in the parking lot; Lewis retrieved the gun he had stashed a
27  few feet away; he admitted nothing prevented him from continuing to walk away; and he fired the gun
28  at the victim from a distance of one or two arms' lengths. (Dkt No. 1, 82:22-88:14.)

1         The DA's closing remarks urged the Board to find Lewis unsuitable for parole. He emphasized
2 the shooting was in the face at point-blank range motivated by a two-year-old $20 debt that had been
3 reduced to $10 that very day. (Id., 91:9-16.) The DA observed the discrepancies in Lewis' statements
4 to authorities and to the Board create a great concern that "Mr. Lewis is engaged in lengthy [sic] period
5 of self-denial." (Id., 93:5-14, 93:14-21 ("That he has engaged in a lengthy period of being untruthful
6 to the board and that it would suggest he hasn't dealt sufficiently with the reality of his crime and he
7 hasn't dealt sufficiently with the fact that he killed a person for t[]en dollars and all those things are
8 highly disturbing in the consideration of parole").) Summarizing the evidence, the DA concluded:
9 "So based upon the criminal activity prior to the time of this offense when he engaged in violent
10 conduct, based upon his own admission that on numerous times he carried a loaded firearm in the
11 neighborhood prior to this offense, his failure to be truthful with the board about his intent and the
12 facts of this particular offense and his failure to deal with the reality of what he's done, I think that his
13 -- the threat he represents to the public is unknown, unpredictable and therefore it's undetermined as
14 to whether -- to the level of risk that he does represent to society were he to [be] paroled based on
15 those factors." (Dkt No. 1, 94:9-23.)

16         Lewis made a statement on his own behalf. "I take full responsibility for what happened to
17 Cecil Gardener." He was "very sorry" he killed him, and acknowledged it was "a serious violent crime
18 which happened 25 years ago and I'm sure his family still grieves over this man." (Dkt No. 1, 95:1-8.)
19 He represented he is today "a changed man," "no longer the bad guy who lived outside the law." (Id.,
20 95:9-10.) He emphasized the positive factors in the record, all of which the panel had acknowledged
21 in the course of the hearing: his GED in 1993; "a number of self-help courses, life skills, anger
22 management, NA" and AA; psych reports showing "low risk of danger to society;" his prison behavior
23 showing positive work history and vocational skills; and his realistic parole plans for transitional group
24 home housing with family support. (Id., 95:11-96:2.)

25         Following the deliberations recess, the panel announced its determination Lewis was "not yet
26 suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety
27 if released from prison." (Dkt No. 1, 99:4-13.) The discrepancies in Lewis' characterizations of the
28 commitment offense particularly troubled the panel. The victim's rap sheet substantiated his troubled

1  past, "but the bottom line [is] there is just so much conflicting stuff in the information that we have
2  on you that, as prior Commissioners have stated and certainly prior prosecutors, it's a big problem."
3  (Id., 99:14-100:7.) The panel noted a commissioner at his 1999 suitability hearing had recommended
4  before his next hearing that Lewis "read the probation officer's report and . . . reflect on what you're
5  saying," because of the impression he gives of "minimizing the claims" and representing "that people
6  lied about the comments that you made." (Id., 100:8-13.) A commissioner at his 2002 hearing made
7  similar observations. (Id., 100:16-22.)

8         The panel indicated it was relying for its denial decision on the gravity of the commitment
9  offense, the way the murder was carried out, Lewis' prior arrests and convictions, and its serious
10 reservations about his level of insight, understanding, and acceptance of responsibility for the crime:
11 "We feel very strongly that you need take [sic] a look at yourself and what your intention was on that
12 particular day and try to -- try to come to some kind of understanding that will help us -- help us to
13 feel like you got some insight on what you were doing because as long as we don't feel like you are
14 responsible for your own behavior or understand your own behavior and what led to it we're not going
15 to be comfortable to let you back out and that's the bottom line." (Dkt No. 1, 101:5-103-17.) "There's
16 just an awful lot of stuff here that makes us uncomfortable and the bottom line is that apart from
17 substance abuse programming in 25 years of being incarcerated, you've participated in AA, you've
18 participated in conflict resolution in '03, you participated in a substance abuse program in '97 and you
19 participated in life skills in the '90's and that's not very much work for a guy that murdered somebody
20 the way having [sic] walked up and shot him in the face." (Id., 102:23-103:7.)

21              C.    **Certain Representations Are Belied By The Record**

22        In his Petition, Lewis makes several inaccurate statements to support his due process argument.
23 He contends the Board "recharacterized" the nature of the commitment offense (Dkt No. 1, p. 4) and
24 failed to give individualized consideration to all relevant factors (Id., p. 12), in particular his favorable
25 psychological reports (Id., p. 13), his institutional behavior (Id., p. 15), his "advances and achievements
26 as factors tending to show suitability for parole" (Id., p. 16), and his "realistic parole plans " (Id., p.
27 18). In fact, the panel stated it "went through everything, that's why it took us so long," before
28 concluding "this was a cold blooded killing" Lewis fails to fully comprehend. (Id., 100:22-2.)

17                                                           08cv0189

1    With respect to the panel's characterization of the crime as a "cold blooded murder," Lewis tries
2  to recast the crime as if his first-degree murder conviction should be disregarded, in reliance on
3  purportedly "undisputed facts" he contends substantiate "Petitioner's crime was due to the realistic
4  belief he was in imminent danger of serious harm by the victim who had severely beaten him in the
5  past and who had tormented and terrorized him over a long period of time." (Dkt. No. 21, 30:24-27;
6  *see also* Dkt No. 1, pp. 8-9.)  On the basis of that argument, he contends the Board arbitrarily and
7  capriciously "mischaracterized" the "commitment offense to a crime carrying a more severe penalty
8  . . . , a violation of Petitioner's liberty interest in parole, and a violation of due process of law." (Dkt
9  No. 1, p. 9.)  That contention is frivolous.  Lewis was tried and convicted of first-degree murder.  He
10  received a sentence carrying a maximum term of life in prison.  "[A] prisoner is not entitled to have
11  his term fixed at less than maximum or to receive parole."  Rosenkrantz, 29 Cal.4th at 655.  Parole
12  denials do not lengthen his sentence.  It is well established there is "no constitutional or inherent right
13  of a convicted person to be conditionally released before the expiration of a valid sentence."
14  Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7 (1979).

15    Lewis' argument the panel failed to consider the entire record is belied by the hearing transcript.
16  (Dkt No. 1, pp. 16, 18.)  The panel discussed Lewis' positive vocational accomplishments, self-help,
17  and educational accomplishments while in prison, but found them to be a thin record for 25-years of
18  incarceration.  The weight to give any circumstance in a particular case "is left to the judgment of the
19  panel."  Lawrence, 44 Cal.4th at 1203.  Similarly, the Board's express acknowledgment of Lewis'
20  behavioral improvements after an initial period of adjustment to prison life disposes of his allegation
21  the Board failed to consider that suitability circumstance.  (Id., p. 64.)  Likewise, the Board quoted
22  extensively from Lewis' recent psychological evaluations, disposing of his claim the Board purportedly
23  "failed to consider Petitioner's favorable psychiatric evaluations."  (Id., p. 13.)  In addition, he argues
24  the Board's recommendation he "get therapy" indicates "an arbitrary and capricious decision" because
25  the psychological reports confirm he currently manifests no particular psychosis or major affective
26  disorder. (*See* Dkt No. 1, pp. 13-14.)  However, that recommendation is consistent with the panel's
27  determination he needs to work on acquiring understanding and insight before the Board is convinced
28  he accepts responsibility for his actions and can conclude he poses no unreasonable public safety risk.

**D.** **The Judicial Decision Upholding Parole Denial On Public Safety Grounds Is Supported By "Some Evidence"**

As established above, the Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits states from depriving persons of liberty interests without due process of law. As construed by the Ninth Circuit in Hayward, California has created by statute for state prisoners serving indeterminate life sentences a liberty interest in release on parole cognizable on federal habeas review. In order to satisfy due process, "some evidence" of present dangerousness must support the denial of parole.

> Since the "some evidence" requirement applies without regard to whether the United States Constitution requires it, we in this case, and courts in this circuit facing the same issue in the future, need only decide **whether the California judicial decision approving the governor's decision rejecting parole was an "unreasonable application" . . . of the California "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence."[[9]]**

Hayward, 603 F.3d at 562-63, *quoting* 28 U.S.C. §§ 2254(d)(1)-(2); *see also* id. at 569, Berzon, J., *concurring in part and dissenting in part* (the "some evidence" rule must be applied in light of the deference owed to the factual determinations of state courts under AEDPA).

The August 7, 2007 Los Angeles County Superior Court decision denying Lewis habeas relief from the Board's February 2006 denial of parole is the only reasoned state court decision addressing the merits of his due process claim. (Dkt No. 1, pp. 287-288.). The record substantiates the Board's decision "reflects due consideration of the specified factors applied to the individual prisoner in accordance with applicable legal standards." Rosenkrantz, 29 Cal. 4th at 676-77. "[T]he court's review is limited to ascertaining whether there is some evidence in the record that supports" the ultimate decision the inmate's release on parole would unreasonably endanger public safety. Id.

---

[9] Lewis misconstrues the scope of federal habeas corpus jurisdiction. As pertinent to his due process claim, relief may only be granted for a deprivation of his liberty interest in parole without "some evidence" that his release would unreasonably endanger public safety. He mistakenly represents: "It is not the 'due process violation' that entitles Petitioner to release on parole: it is the fact that he is rehabilitated" and suitable for release, with "his continued incarceration . . . a miscarriage of justice [and] contrary to the public good." (Dkt No. 21, 3:22-28.) Similarly, a federal habeas court has no power to grant relief for alleged "abuse of discretion" by a state court. (*See* id., 4:23.) His articulations of various other legal standards in his 33-page Traverse are either inapplicable to this proceeding or have been superseded by the standards established in the Hayward *en banc* decision and binding on this court.

1    The Superior Court "read and considered" Lewis' petition and "independently reviewed the

2    record, giving deference to the broad discretion of the [Board] in parole matters," before concluding

3    "the record contains 'some evidence' to support the Board's finding that the Petitioner is unsuitable for

4    parole." (Dkt No. 1, p. 287, *citing* CAL. CODE REGS., tit. 15, § 2402 *and* Rosenkrantz, 29 Cal.4th at

5    667.) The court characterized the Board's decision as based on the unsuitability factors of the

6    "commitment offense and the Petitioner's criminal history." (Id.)

> The Court finds that there is "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. The commitment offense was carried out in a dispassionate and calculated manner, in that the Petitioner went home and got the weapon and subsequently killed the victim by shooting him in the face. There was not evidence that the victim had attacked the Petitioner. Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(B). In addition, the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering, in that the Petitioner proceeded to shoot the victim again in the face when he had already been shot and was on the ground. Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D). Furthermore, the motive for the crime was very trivial in relation to the offense, in that it involved a dispute over $10. Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(E).
>
> The Board also noted the Petitioner's criminal record, which included a conviction for battery as well as for other lesser offenses. While this battery conviction was not, in and of itself, a sufficient basis upon which to deny parole, it was properly considered. Cal. Code Regs., tit. 15, § 2402(b).

(Dkt No. 1, pp. 287-288.)

"The nature of the prisoner's offense alone can constitute a sufficient basis for denying parole," and "the authority properly may weigh the degree of violence used and the amount of viciousness shown by a defendant," as long as the decision reflects "individualized treatment and due consideration" of all relevant and reliable information. Rosenkrantz, 29 Cal.4th at 682-84. To satisfy due process, California's "some evidence" standard also requires a connection between the crime and the finding of a public safety risk based on the prisoner's "current circumstances." Lawrence, 44 Cal.4th at 1227. Standing alone, evidence of particular unsuitability factors does not satisfy due process. *See* Hayward, 603 F.3d at 562; Rosenkrantz, 29 Cal.4th at 263. For example, the "prisoner's aggravated offense does not establish current dangerousness 'unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and

20                                                                 08cv0189

1    mental state, supports the inference of dangerousness,' " the "determining factor" for a legitimate denial
2    of parole. Hayward, 603 F.3d at 562, *quoting* Lawrence, 44 Cal.4th at1210, 1213-14.

3         The state court singled out the unsuitability factors of the gravity of Lewis' commitment offense
4    and his prior criminal history as the basis for the Board's decision, and found those factors are
5    supported by the evidence. The court relegated to an unexpressed inference the core determination
6    those remote factors remain probative of his present dangerousness. The court's description of the
7    Board's findings is not, however, inclusive of the panel's entire rationale and reasoning. The court did
8    not articulate crucial factors the Board expressly relied on to deny Lewis parole, in particular
9    considerations establishing the necessary connection between those immutable unsuitability factors
10   and his current dangerousness. This Court must decide the Petition by answering the question whether
11   the state court's *decision* to uphold the 2006 Board's denial of parole is supported by "some evidence"
12   probative of Lewis's current unsuitability for release on public safety grounds. Rosenkrantz, 29 Cal.
13   4th at 676-77; *see* Hayward, 603 F.3d at 562-63; *see also* Bell, 535 U.S. at 694 (federal habeas relief
14   is warranted only if *the result* of a claim adjudicated on the merits by a state court "was contrary to,
15   or involved an unreasonable application of, clearly established Federal law, as determined by the
16   Supreme Court of the United States," or "was based on an unreasonable determination of the facts in
17   light of the evidence presented in the State court proceeding").

18        The transcript of the February 2006 suitability hearing demonstrates the Board gave Lewis
19   "individualized consideration" of factors supported by evidence in the record tending to show
20   suitability as well as those tending to show unsuitability. The panel members stated that in reaching
21   their decision, they looked through the entire record, the police reports, the witness statements, all the
22   prior suitability hearing transcripts, and Lewis' psychological evaluations, before reaching their
23   conclusion. The panel explicitly based its determination to deny parole not only on the gravity and
24   manner of Lewis' commitment offense, but also on: his lack of insight into and understanding of the
25   crime and why he committed it; insufficient acceptance of responsibility for his actions;
26   inconsistencies in his versions of what happened and his attempts, including at the 2006 suitability
27   hearing, to distance himself from his own prior statements while accusing others of lying in the official
28   record, efforts intended to minimize his culpability; and his only modest programming efforts during

1   his twenty-five years in prison.  The Court finds all those considerations are supported by the
2   evidentiary record and supply the "something in the prisoner's pre- or post-incarceration history" and
3   his "current demeanor and mental state" necessary to establish an inference of "present dangerousness,"
4   the "determining factor" for a legitimate denial of parole.  Hayward, 603 F.3d at 562, *quoting*
5   Lawrence, 44 Cal.4th at1210, 1213-14.

6          This Court's independent review of the hearing transcript and pertinent portions of the record
7   reveals the state court decision approving the Board's denial of parole was not an unreasonable
8   application of the California "some evidence" requirement, nor was it "based on an unreasonable
9   determination of the facts in light of the evidence."  Hayward, 603 F.3d at 562-63, *quoting* 28 U.S.C.
10  §§ 2254(d)(1)-(2).  Due process is satisfied when, as here, the parole denial "*decision* is supported by"
11  at least "a modicum of evidence."  Rosenkrantz, 29 Cal. 4th at 676-77 (emphasis added).  Lewis is
12  accordingly not in custody "in violation of the Constitution or laws or treaties of the United States,"
13  foreclosing federal habeas relief.  28 U.S.C. § 2254(a).

14  **III.    CONCLUSION AND ORDER**

15         For all the foregoing reasons, the Court finds no due process violation accompanied denial of
16  Lewis' parole in 2006 because "some evidence" supported that decision, as required under the
17  California statute creating a liberty interest in parole.  *See* Pearson, 606 F.3d at 608-09.  **IT IS**
18  **HEREBY ORDERED** Lewis' Petition is **DENIED**.  The Court finds no basis for a certificate of
19  appealability.  Judgment shall be entered accordingly.

20         **IT IS SO ORDERED.**
21  Dated:  _8-5-10_

                                          HONORABLE DANA M. SABRAW
22                                        UNITED STATES DISTRICT JUDGE
23
24
25
26
27
28

22                                                          08cv0189